**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIE LIGHTNER, | : | CIVIL ACTION NO. 1:04-CV-2334 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| LIBERTY LIFE ASSURANCE | : | |
| COMPANY OF BOSTON, | : | |
| | : | |
| Defendant | : | |

## <u>MEMORANDUM</u>

Presently before the court are cross-motions for summary judgment (Docs. 12, 14) with respect to the claim of plaintiff, Julie Lightner ("Lightner"), to recover disability benefits allegedly owed to her by defendant, Liberty Life Assurance Company of Boston ("Liberty"), under an employee benefit plan subject to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1401.  Lightner argues that Liberty, administrator of the plan, improperly refused and then terminated her disability benefits.  Liberty disagrees, and contends that the evidence before it was insufficient for a finding that Lightner was unable to perform her job, and that Lightner's own physician approved her return to work.  After a thorough review of the record, and for the reasons that follow, the court will grant Liberty's motion for summary judgment and deny Lightner's motion for summary judgment.

I.    **Statement of Facts**[1]

Lightner is employed by the Milton S. Hershey Medical Center ("HMC") as a patient billing assistant. (Doc. 15 ¶¶ 1,2; Doc. 25 ¶¶ 1,2; Doc. 17 at LL-0197.) Her job description requires that she perform basic accounting duties, such as preparing and reconciling daily bank deposits, resolving credit balances, and downloading and resolving lockbox deposits. (Doc. 17 at LL-0197.) As an HMC employee Lightner is eligible for long-term benefits through a group disability policy with Liberty. (Doc. 15 ¶¶ 1,2; Doc. 25 ¶¶ 1,2.) The terms of the disability policy provide, in pertinent part, as follows:

> When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered person a Monthly Benefit after the end of the Elimination Period . . . . The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:
>
> 1.  Disability;
>
> 2.  Regular Attendance of a Physician; and
>
> 3.  Appropriate Available Treatment.

(Doc. 17 at LL-0017.) "Proof" of a disability includes an attending physician's statement attesting to the disability, as well as the physician's "standard of diagnosis, chart notes, lab findings, test results, x-rays and[/]or other forms of objective medical evidence." (Doc. 17 at LL-0097.) These submissions must

---

[1] The facts presently before the court are largely uncontroverted. (Compare Doc. 15 with Doc. 25.)

demonstrate that, as a result of injury or sickness, the individual covered by the policy is "unable to perform the [m]aterial and [s]ubstantial [d]uties" of his or her occupation for a minimum period of 180 days after the onset of the disability.  (Doc. 17 at LL-0006; see also id. at LL-0008 (defining "material and substantial duties").)  It is only after this 180 day "elimination period" that benefits will begin to accrue.  (Doc. 17 at LL-0007.)

On February 17, 2004, Lightner submitted a claim to Liberty under its disability policy.  (Doc. 17 at LL-0193-94.)  The claim stated that Lightner was involved in an automobile accident on September 18, 2003, resulting in a "head injury," "nerve damage in the head," and "severe pain in the head."  (Doc. 15 ¶ 1; Doc. 25 ¶ 1; Doc. 17 at LL-0193.)  Lightner also submitted a copy of her job description (Doc. 15 ¶ 4; Doc. 25 ¶ 4; Doc. 17 at LL-0197), a form completed by HMC setting forth Lightner's job title and hours of employment (Doc. 17 at LL-0192), and an "attending phsyician's statement," completed by James P. Argires, M.D. ("Dr. Argires") of Lancaster Neuroscience and Spine Associates.  (Doc. 17 at LL-0195-196.)  According to the physician's statement, Lightner suffered from headaches as a result of "post concussion syndrome."  (Doc. 17 at LL-0195.)  Dr. Argires prescribed various medications for Lightner, ordered an MRI, and referred her to Stephen C. Ross, M.D. ("Dr. Ross"), a neurologist at HMC, for further testing.  (Doc. 17 at LL-0196.)  The physician's statement identified various categories of limitations.  The categories of "mental/nervous impairment" and "cardiac impairments" were noted inapplicable, but, under the category of "physical

3

impairment," a box was checked indicating "[s]evere limitation of functional capacity; incapable of minimum activity." (Doc. 17 at LL-0196.)

After its initial review of Lightner's claim, Liberty requested additional information from Lightner and her physicians. (Doc. 15 ¶ 6; Doc. 25 ¶ 6.) Thereafter, Liberty received a "physician's special report" (Doc. 17 at LL-0214), the results of an MRI and a CAT scan (Doc. 17 at LL-0206, 0212), correspondence written by Dr. Argires to Lightner's family physician, Stanley Godshall, M.D. ("Dr. Godshall") of Norlanco Medical Associates ("Norlanco") (Doc. 15 ¶ 6; Doc. 25 ¶ 6; Doc. 17 at LL-0201, 0203, 0205, 0207, 0209, 0210), a referral letter to Dr. Ross (Doc. 17 at LL-0199-200), and copies of several excuse slips written by Dr. Argires (Doc. 17 at LL-0202, 0204).

The "physician's special report," dated October 28, 2003, indicated that Lightner was being treated with medication for post-concussion syndrome, and that she "could not return to work" at that time. (Doc. 17 at LL-0214.) The MRI results, with the exception of a notation that Lightner suffered from "minimal sinus disease," were normal. (Doc. 17 at LL-0166, 0206.) The CAT scan results were also normal, indicating that Lightner's "ventricles and extra-axial spaces" were "normal in size and shape," her "bony structures" were intact, her parenchyma "demonstrate[d] no foci of abnormal attenuation," and that there was "no evidence of an intracranial hemorrhage or mass lesion." (Doc. 17 at LL-0158, 0212.)

The correspondence submitted by Lightner consisted of several letters from Dr. Argires to Dr. Godhsall, and one letter from Dr. Argires to Dr. Ross. The first

letter to Dr. Godshall reflects that Lightner was examined on October 28, 2003 for a headache.  (Doc. 17 at LL-0170, 0173, 0214.)  Lightner complained of "left-sided headache patterns" that were "sharp and lancinating at times," spreading on occasion to the right side of her head.  (Doc. 17 at LL-0127, 0211.)  Although she was not experiencing any nausea or vision problems, she was experiencing anxiety and having "difficulty with concentration and memory."  (Doc. 17 at LL-0127, 0211.)  Her medical evaluation was "remarkable for fatigue, dizziness, shortness of breath and headaches."  (Doc. 17 at LL-0127, 0211.)

Another letter to Dr. Godshall, dated November 11, 2003, advises that Lightner's neurological examination is normal.  (Doc. 17 at LL-0126, 0208, 0209.) Dr. Argires did not believe that there was a "strong element of post traumatic stress," but he indicated that Lightner was "[not] quite ready to return to gainful employment."  (Doc. 17 at LL-0126, 0208, 0209.)

A third letter to Dr. Godshall, dated November 25, 2003, relates that Lightner complains of "lightening-like pains across the right frontal area" of her head.  (Doc. 17 at LL-0125, 0207.)  In this letter, Dr. Argires observes that the results of a neurological examination are still normal, but notes that Lightner is suffering from a "considerable amount of anxiety."  (Doc. 17 at LL-0125, 0207.)

The fourth letter to Dr. Godshall is dated December 9, 2003.  (Doc. 17 at LL-0124, 0205.)  Dr. Argires indicates again that Lightner's neurological examination is normal.  (Doc. 17 at LL-0124, 0205.)  However, he observes that medication prescribed is not providing any relief.  (Doc. 17 at LL-0124, 0205.)  Dr. Argires

examined Lightner again less than three weeks later, and wrote to Dr. Godshall, describing Lightner's pain as a "dull ache from time to time." (Doc. 17 at LL-0123, 0203.) Notably, he observed that it "switched" from the left side of her head to the right side, and that prescription medications were providing "no relief." (Doc. 17 at LL-0123, 0203.) Dr. Argires indicated that Lightner's CAT scan and MRI results did not reflect any "postconcussion problem[s]," and that Lightner's condition "may just be post-traumatic stress." (Doc. 17 at LL-0123, 0203.)

The final letter to Dr. Godshall submitted by Lightner is dated January 7, 2004. (Doc. 17 at LL-0122, 0201.) In it, Dr. Argires states that several medications are not affording Lightner any relief, that her problem is likely "a traumatized supraorbital nerve," and that Lightner will be referred to another physician for a second opinion. (Doc. 17 at LL-0122, 0201.)

The correspondence from Dr. Argires to Dr. Ross is a referral letter dated January 20, 2004. (Doc. 17 at LL-0120, 0199.) In this letter, Dr. Argires describes Lightner's symptoms and course of treatment, and relays that one medication is providing relief. (Doc. 17 at LL-0120, 0199.) Dr. Argires states that he is unsure whether Lightner had a "contused supra-orbital nerve," but that it "might be the answer" to her complaints. (Doc. 17 at LL-0120, 0199.)

The excuse slips submitted by Lightner to Liberty were prepared by Dr. Argires. These slips are dated December 9, 2003, and January 7, 2004. (Doc. 17 at LL-0202, 0204.) The December slip notes that Lightner was "under [Lancaster Neuroscience and Spine Associates'] care" and that she "continues to be disabled

6

until further notice due to [a] medical condition." (Doc. 17 at LL-0138, 0168, 0204.) The January slip requests that Lightner be excused from work "[u]ntil further notice," and states that Lightner is "being treated for post traumatic stress syndrome, and supra orbital neuropathy." (Doc. 17 at LL-0202.)

On March 18, 2004, a nurse at Liberty reviewed all of the documents submitted by Lightner. (Doc. 15 ¶ 7; Doc. 25 ¶ 7; Doc. 17 at LL-0185-86.) The nurse drafted a memorandum, in which she listed the injuries sustained by Lightner following her accident. (Doc. 17 at LL-0185.) The memorandum indicates that Lightner complained of sharp headaches on the left side of her head and had difficulty with her memory and concentration at times, and that Lightner was being treated by Drs. Argires and Godshall. (Doc. 17 at LL-0185.) The nurse also reviewed the medications prescribed to Lightner, the results of the CAT scan, MRI, and neurological examinations, and Dr. Argires' assessment that Lightner may be suffering from post traumatic stress disorder, and may have contused the frontal branches of her supra-orbital nerve. (Doc. 17 at LL-0185.)

In her memorandum, the nurse expressed several concerns with the medical records. For example, Lightner's position as a patient billing assistant was "sedentary" work, and any limitations with respect to that position were not adequately documented. (Doc. 17 at LL-0186.) Further, the medical evidence appeared to be inconsistent with Dr. Argires' diagnosis of post concussion syndrome. The nurse opined that "[p]ost concussion syndrome—PCS—is a specific set of neuropsychological thinking, behavioral, and emotional disorders caused by

traumatic brain injury, aka concussion.  PCS results from actual, physical damage, or injury to the brain caused by an external force." (Doc. 17 at LL-0185.)  However, Lightner's complaints of memory and concentration had not been objectively tested, her CAT scan and neurological examinations were normal, her MRI reflected only minimal sinus disease, and Dr. Argires had found that Lightner did not suffer from a mental nervous impairment. (Doc. 17 at LL-0186-87.)  The nurse concluded that "[Lightner] may need to have more extensive testing done—or [a] [seco]nd opinion—overall [Lightner's] symptoms are self reported[.]" (Doc. 17 at LL-0185.)

Following the nurse's review, on March 23, 2004, Liberty sent to Lightner correspondence denying her disability benefits. (Doc. 17 at LL-0182-83.)  The letter stated that Lightner's occupation as a patient billing assistant required sedentary activity, and that the information provided by Lightner was insufficient to demonstrate that she could no longer perform that position. (Doc. 17 at LL-0183.)  The letter noted that Lightner complained of post concussion syndrome and headaches, but that the results of her CAT scan and MRI were normal. (Doc. 17 at LL-0182.)  The letter also stated that Lightner's memory and concentration problems were not objectively tested, and that the results of her neurological examination were normal. (Doc. 17 at LL-0182.)  Although Lightner was diagnosed as suffering from post traumatic stress syndrome, the letter observed that other medical records were inconsistent with this diagnosis and specifically indicated that Lightner did not have a mental nervous impairment. (Doc. 17 at LL-0183.)  The

8

letter also noted that, despite Dr. Argires' encouragement of a second opinion,

Liberty did not have in its possession any medical records from Dr. Ross, to whom

Lightner was referred.  (Doc. 17 at LL-0182-83.)  The letter concluded:

> Your records were submitted to our medical staff for review.  This review
> concluded that post concussion syndrome entails neuropsychological deficits
> that have not been objectively tested and traumatic brain injury or
> concussion which is not indicated to have taken place.  All of your symptoms
> are self reported and any related impairments have not been objectively
> documented.

(Doc. 17 at LL-0183.)

Lightner was invited to request a review of the denial of benefits within 180

days, and counseled that she should supplement the record with "documentation

such as [a] neuro-psychological examination, hospital records, Dr. Ross' findings

and any other diagnostic clinical data from September 2003 to current date" to

support her claim.  (Doc. 17 at LL-0183.)

Lightner subsequently retained counsel.  (Doc. 15 ¶ 9; Doc. 25 ¶ 9; Doc. 17 at

LL-0151.)  On March 30, 2004, counsel for Lightner wrote to Liberty and requested

a review of Liberty's denial of disability benefits.  (Doc. 17 at LL-0151.)  Counsel

forwarded to Liberty supplemental documentation, including medical records from

Dr. Godshall and disability slips and billing statements from Dr. Argires.  (Doc. 15

¶ 9; Doc. 25 ¶ 9; Doc. 17 at LL-0151.)  Counsel also submitted a September 18, 2003

x-ray report of Lightner's skull, which noted that the "calvarium appear[ed] intact,"

the "osseous structures and soft tissues" were "unremarkable," and that there was

"[n]o evidence of a fracture."  (Doc. 17 at LL-0160.)  Other documents reflected that

Lightner was seen by a Norlanco physician the day after her x-ray.  (Doc. 17 at LL-0159.)  She was diagnosed with multiple contusions as a result of the car accident, and given precautions regarding her head.  (Doc. 17 at LL-0155.)  At that time, Lightner denied having a significant headache, and there were no signs of a fracture or a dislocation.  (Doc. 17 at LL-0155, 0159.)  The attending physician prepared an excuse slip, which stated simply that "Julie Lightner missed work today, under our care."  (Doc. 17 at LL-0132, 0156.)

The documents also reflected that Lightner was examined by a Norlanco physician again on September 22, 2003.  (Doc. 17 at LL-0155.)  At that time she was experiencing "sharp pains that fly in her head."  (Doc. 17 at LL-0154-55.)  The attending physician indicated that she could take over-the-counter medication, and noted that he did not expect Lightner to have "any chronic problems" and her recovery would  "simply take time."  (Doc. 17 at LL-0154.)  Another excuse slip was prepared for Lightner, which stated that she "[m]ay return to work as soon as [she is] feeling better."  (Doc. 17 at LL-0133, 0157.)

The additional documents submitted by counsel included notes from an office visit to Norlanco on September 27, 2003.  (Doc. 17 at LL-0154.)  On this occasion, Lightner felt "weird and sleepy" and had "a left-sided headache that [was] very severe at night."  (Doc. 17 at LL-0154.)  The attending physician diagnosed Lightner with suffering from a concussion, and she was told to "stay off work until she is feeling better."  (Doc. 17 at LL-0154.)  She was also referred to a radiologist for a CAT scan.  (Doc. 17 at LL-0154.)  Lightner returned to Norlanco two days later,

10

on September 29, 2003.  (Doc. 17 at LL-0154.)  At that time she was diagnosed with a

contusion of the chest wall, sprain of the right knee, contusion of the left temple,

and a concussion.  (Doc. 17 at LL-0154.)  Notes of this visit indicate that Lightner's

neurologic examination was "grossly normal," but that she reported feeling "fuzzy"

and "unstable," and that she was getting "severe headaches at night," and did not

want to drive a car.  (Doc. 17 at LL-0154.)  Lightner indicated that she was having

pains "in the l[eft] frontal area when she stands for 10 minutes or more . . . . [and]

when she is active . . . ."  (Doc. 17 at LL-0153.)  The physician's notes indicated that

Lightner's examination was otherwise "totally normal," and she was given an

excuse slip to be off of work from September 19 through October 21, 2003.  (Doc. 17

at LL-0153.)

Counsel also submitted a report prepared by Dr. Argires on October 28, 2003

for the benefit of Lightner's employer.  (Doc. 17 at LL-0170.)  The report indicates

that Lightner suffered from "post concussion syndrome," that she was being

treated with medication, and that she could not return to work.  (Doc. 17 at LL-0135,

0170, 0173.)  A patient status report dated November 11, 2003 indicates that

Lightner was experiencing headaches and could not return to work at that time.

(Doc. 17 at LL-0171, 0172.)

Finally, the additional documents included various excuse slips, reflecting

that Lightner was to be excused from work from September 19, 2003 through

October 7, 2003 "due to injuries" (Doc. 17 at LL-0132, 0157), and from September 19,

2003 through October 21, 2003, "due to concussion syndrome" (Doc. 17 at LL-0133,

11

0156).  Excuse slips prepared by Dr. Argires on November 25, 2003, December 9,

2003, and February 24, 2004 requested that her employer excuse Lightner from

work "until further notice," and a March 10, 2004 excuse slip asks that she be

excused from work "[u]ntil [her] next appointment."   (Doc. 17 at LL-0137, 0161,

0162, 0167.)

Liberty's nurse examined these additional documents and, on April 8, 2004

made the following observations:

> Reviewed info[rmation] sent by [attorney] for [Lightner] — info[rmation]
> contains [CAT scan] which is normal, [right] knee x-rays which are negative
> for fracture[s,] and skull series which is negative.  There are notes from Dr.
> [Godshall] from 9/22/03 - 10/10/03. [These] notes state that [Lightner] had
> some contusions of the scalp . . . [Lightner claims of]
> headaches—neurological exam[ination]s are normal[, Lightner] has full
> [range of mobility] of knee—has some tenderness on the [right] side of the
> low anterior chest but no ecchymosis. [O]n 9/22/03 Dr. [Godshall] states that
> he [does not]expect [Lightner] to have any chronic problems [and] on
> 10/15/03 [doctor] states that examination is totally normal—[Lightner
> complains] of headaches when she stands[,] but when she is active headaches
> bother [her] more. [CAT scan] is normal per [medical doctor.] The rest of the
> info[rmation] sent in are work excuses from the [medical doctor] neurologist
> Dr. Argires [and] billing notes with code for headaches.

(Doc. 17 at LL-0149.)  The nurse concluded:

> There is no new medical information to support [Lightner's] lack of
> functional activity—there are no restrictions from either [medical doctor] or
> info[rmation] that supports that [Lightner] cannot perform in a sedentary
> position.  Complaints of headaches are self-reported—all exam[ination]s are
> normal.  The maximum PR duration for a concussion in a sedentary position
> is 21 days—[Lightner's] m[otor] v[ehicle] a[ccident] occured in Sept[ember]
> 2003[.]  There is also no current information or testing results.

(Doc. 17 at LL-0149.)

12

Following the nurse's review of the record, Liberty advised Lightner's attorney that it was forwarding Lightner's file to an "Appeal Unit" for review of the denial of her claim for disability benefits.  (Doc. 17 at LL-0148.)  On April 13, 2004, Liberty wrote to counsel for Lightner, acknowledging receipt of the additional documents.  (Doc. 17 at LL-0146.)  Liberty noted that the documents originating from Dr. Argires listed treatments and visits only through October 10, 2003, and requested that counsel "follow up with Dr. Argires and any other of [Lightner's] treating physicians" and send to Liberty "any office treatment notes, medications, consultations, diagnostic test results (MRI's, EMG's, etc) and any other medical information documentation that may be supportive" of Lightner's disability claim.  (Doc. 17 at LL-0146.)  Liberty extended the deadline for counsel to submit this supplemental information to May 11, 2004.  (Doc. 17 at LL-0146.)

Counsel for Lightner responded a week later, forwarding an April 14, 2004 letter from Dr. Ross.  (Doc. 15 ¶ 11; Doc. 25 ¶ 11; Doc. 17 at LL-0080.)  In the letter Dr. Ross states that he saw Lightner on only one occasion, and that Lightner's condition at that time was "good."  (Doc. 17 at LL-0080, 0144.)  Dr. Ross diagnosed Lightner with "new daily persistent headache, most consistent with post-traumatic chronic migraine."  (Doc. 17 at LL-0080, 0144.)  Dr. Ross indicates that he did not render any treatment because Lightner's visit was "only a consultation," and that as of February 10, 2004 her prognosis was "excellent."  (Doc. 17 at LL-0080, 0144.)  These statements were made by Dr. Ross "to a reasonable degree of medical certainty."  (Doc. 17 at LL-0080, 0144.)

Counsel for Lightner also sent to Liberty copies of a number of previously submitted documents (see Doc. 17 at LL-0130, 0132, 0132, 0135, 0137, 0138, 0140, 0141, 0142, 0156, 157, 0161, 0162, 0167, 0168, 0170, 0173, 0174), as well as: a nondated physician's slip to excuse Lightner from work from September 19, 2003 through November 5, 2003 "due to illness" (Doc. 17 at LL-0134); a November 11, 2003 patient status report indicating that Lightner "cannot return to work at this time" (Doc. 17 at LL-0136); a February 10, 2004 physician's slip signed by Dr. Ross, which states simply that Lightner "was here today" (Doc. 17 at LL-0141); a March 31, 2004 excuse slip signed by Dr. Argires, requesting that HMC "please excuse [Lightner] from work" (Doc. 17 at LL-0142); and a nondated excuse slip from Dr. Argires, asking that Lightner be excused from work "[u]ntil further notice" (Doc. 17 at LL-0139).

On April 29, 2004, counsel for Lightner submitted more records to Liberty. (Doc. 17 at LL-0112, 0113.) These records include a letter from Dr. Argires dated April 15, 2004 and addressed to Lightner's counsel, stating that Lightner was, "for all practical purposes . . . diagnosed as a traumatic migraine problem." (Doc. 17 at LL-0113.) Dr. Argires admitted that he did not have any "x-rays . . . MRI studies [or] any other sophisticated studies that give the physical kind of pain" that Lightner was experiencing. (Doc. 17 at LL-0113.) The letter indicates that Drs. Argires and Ross attempted to resolve the problems for Lightner, but "have, thus far, failed." (Doc. 17 at LL-0113.) It candidly relays that Dr. Argires could do little else for Lightner, and that she "is incapacitated due to her pain. This is of a

14

subjective nature and we have no physical findings to support the symptomatology." (Doc. 17 at LL-0113.)

Counsel also submitted a February 10, 2004 letter from Dr. Ross to Dr. Argires, relaying that Lightner was reporting daily headaches with a pain intensity of 8 on a scale of 1 to 10. (Doc. 17 at LL-0083-84, 0117.) It indicates that Lightner's pain is typically in the forehead, but that at times it "radiates into the right face and right cheek." (Doc. 17 at LL-0083-84, 0117.) Dr. Ross notes that Lightner also had symptoms of "nausea, sometimes vomiting, photophobia, phonophobia, difficulty concentrating, cognitive slowing, and imbalance." (Doc. 17 at LL-0083-84, 0117.) There was "no set pattern to this pain," and Lightner's neurologic and other examinations were otherwise normal. (Doc. 17 at LL-0083-84, 0117.) Nor was there evidence of any permanent neurological damage. (Doc. 17 at LL-0083-84, 0117.) Her condition was diagnosed as being consistent with "posttraumatic chronic migraine." (Doc. 17 at LL-0083-84, 0118.) Dr. Ross advised Lightner that her "prognosis is excellent," and that he anticipated "total resolution to her symptoms." (Doc. 17 at LL-0083-84, 0118.) According to Dr. Ross, the "key" to managing Lightner's discomfort was a "prohylaxis," and he recommended that she be sent to a certain physician for "biofeedback for head and neck relaxation," that she be "placed on riboflavin," and that she be prescribed a certain medication. (Doc. 17 at LL-0083-84, 0118.)

The additional documents submitted by counsel reflect that Dr. Argires saw Lightner on March 31, 2004, and communicated to Dr. Godshall that Lightner was

"continuing to complain of . . . . significant headache patterns." (Doc. 17 at LL-0115.)  On February 24, 2004, Dr. Argires corresponded with Dr. Godshall to advise him that Dr. Ross recommended essentially the same course for treatment with a variation of medications and that Lightner should not return to work.  (Doc. 17 at LL-0116.)  Dr. Argires further noted that he was hopeful that Lightner's "post traumatic headache pattern" would be "cured" with medication over a period of time.[2]  (Doc. 17 at LL-0116.)

On May 6, 2004, Liberty sent all of the documents submitted by Lightner and her attorney to one of Liberty's consulting physicians, Gale G. Brown, Jr., M.D. ("Dr. Brown").  (Doc. 15 ¶ 14; Doc. 25 ¶ 14; Doc. 17 at LL-0108, 0043 at note 13.)  Dr. Brown reviewed the medical records from Drs. Ross, Argires, and Godshall, Norlanco medical records, documents regarding various diagnostic test results and statements on work capacity, and a description of Lightner's work duties.  (Doc. 15 ¶ 14; Doc. 25 ¶ 14; Doc. 17 at LL-0109.)  On May 20, 2006 Dr. Brown telephoned Dr. Argires to discuss Lightner's medical and functional status.  (Doc. 15 ¶ 15; Doc. 25 ¶ 15; Doc. 17 at LL-0088, 0092, 0094, 0097, 0111.)  Dr. Argires relayed to Dr. Brown that Lightner's diagnosis was the same as it had been for many months, to wit: post-traumatic migraine and post-traumatic stress disorder.  (Doc. 17 at LL-0111.)  Dr. Argires observed that Lightner was showing improvement with certain

_____

[2]  Other documents submitted by counsel consisted of copies of letters from Dr. Argires to Dr. Godshall that were previously submitted to Liberty.  (See Doc. 17 at LL-0120, 0122, 0123, 0124, 0125, 0126, 0127, 0128, 0129, 0199, 0201, 0203, 0205, 0207, 0209, 0210, 211, 0213.)

medication, and that he did not recommend a neuropsychological assessment. (Doc. 17 at LL-0088, 0092, 0094, 0097, 0111.)  Interestingly, Dr. Argires informed Dr. Brown that Lightner could return to work on a part-time basis, resuming full time employment within two weeks.  (Doc. 15 ¶ 15; Doc. 25 ¶ 15; Doc. 17 at LL-0088, 0092, 0094, 0097, 0100, 0107, 0111.)

Based upon a review of the medical records, Dr. Brown concluded, "to a reasonable degree of medical certainty," that Lightner "d[id] not have verifiable residual physical or cognitive impairment precluding resumption of work as [a] patient billing assistant." (Doc. 17 at LL-0108.)  Dr. Brown found that, although the evidence substantiated a "direct left frontal parietal contusion," the severity of the injury was relatively mild. (Doc. 17 at LL-0108.)  Dr. Brown took into consideration the physical examinations and documentation of Lightner's hemotoma and headaches, and the lack of objective evidence of injury in the MRI, the CAT scan, the x-rays, or the neurological examinations. (Doc. 17 at LL-0108.)  Dr. Brown noted that Lightner's symptoms could generally be explained by her "left frontal parietal scalp contusion," but that her headaches were "somewhat inconsistent" as they "fluctuat[ed] from left to right" and had "no pattern" or any "precipitating [or] alleviating factors." (Doc. 17 at LL-0109.)  Dr. Brown opined that the appropriate evidence for Lightner's purported injury would be neurocognitive testing, but that such testing data had not been submitted, that Dr. Argires did not recommend such testing and, in fact, recommended Lightner's return to work.  Dr. Brown also noted

Dr. Ross' earlier opinion that Lightner did not suffer from permanent neurological damage and that her prognosis was "excellent." (Doc. 17 at LL-0109.)

On May 25, 2004, Liberty sent to Lightner a letter partially granting her disability claim. (Doc. 17 at LL-0103.) Based upon Dr. Brown's review, Liberty concluded that the material before it did not demonstrate that Lightner's injury "prevent[ed] her from performing the material and substanial duties of her occupation." (Doc. 17 at LL-0100.) However, Liberty agreed to extend benefits to Lightner from the commencement of her eligibility (180 days post accident) to the date that Dr. Argires approved her return to work, i.e. from Wednesday, March 17, 2004 through Friday, June 4, 2004. (Doc. 17 at LL-0098-0103.) The letter concluded that Liberty's appeal process had been exhausted, that Lightner's case was formally closed, and that Lightner was entitled to bring an ERISA action for a review of Liberty's determination. (Doc. 17 at LL-0102.)

On June 14, 2004 counsel for Lightner submitted to Liberty an excuse slip from Norlanco, to excuse Lightner from work until her next appointment on June 14, 2004. (Doc. 17 at LL-0090-91.) Liberty wrote to counsel, reiterating that Lightner's case was closed, and that Lightner could obtain a review of Liberty's determination by filing a lawsuit under ERISA. (Doc. 17 at LL-0088-89.) On June 17, 2004, counsel for Lightner sent to Liberty an additional excuse slip from Norlanco. (Doc. 17 at LL-0086-87.) The slip stated that Lightner "should be on disability for the next month," until July 14, 2004. (Doc. 17 at LL-0087.) The following day counsel submitted to Liberty additional documents, concerning

18

Lightner's visit to Dr. Ross.  (Doc. 17 at LL-0073.)  Liberty responded by noting that

the excuse slips submitted "[did] not provide any specific dates of treatment,

restrictions or limitations, or diagnostic test results" to support en extension of

disability benefits.  (Doc. 17 at LL-0071.)  Liberty noted that the additional

information concerning Dr. Ross was already in Lightner's file and had been

considered in the context of the appeal decision.  (Doc. 17 at LL-0071.)  Liberty

again reiterated that Lightner could seek review of its disability determination by

filing an ERISA action.  (Doc. 17 at LL-0072.)

The instant matter was commenced by Lightner on September 23, 2004 in

the Dauphin County Court of Common Pleas.  (See Doc. 1, Ex. A.)  Thereafter,

Liberty removed the action to this court, and Lightner filed an amended complaint.

The amended complaint alleges that Lightner is disabled and entitled to benefits

under Liberty's disability insurance plan.  (See Doc. 4.)  Cross-motions for summary

judgment are currently before the court and are now ripe for disposition.[3]  (See

Docs. 12, 14.)

---

[3]  The motions were filed in March 2005.  (See Dcos. 12, 14.)  However,
disposition of the motions was postponed pending the parties' submissions of
opposing statements of material facts, filed in November 2005.  (See Docs. 24, 25,
26); see also L.R. 56.1 ("A motion for summary judgment . . . shall be accompanied
by a separate, short and concise statement of material facts . . . .  All material
facts . . . will be deemed to be admitted unless controverted by the statement
required to be served by the opposing party.").

II.   <u>**Standard of Review**</u>

"Summary judgment serves as a minimal but important hurdle for litigants to overcome before presenting a claim to a jury." <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 314 (M.D. Pa. 2004).  Faced with such a motion, the adverse party must produce affirmative evidence, beyond the disputed allegations of the pleadings, in support of the claim.  FED. R. CIV. P. 56(e); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Corneal v. Jackson Township</u>, 313 F. Supp. 2d 457, 464 (M.D. Pa. 2003), <u>aff'd</u>, 94 Fed. Appx. 76 (3d Cir. 2004).  "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 231-32 (3d Cir. 2001) (quoting <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460-61 (3d Cir. 1989)).  Only if this burden is met can the cause of action proceed.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see</u> FED. R. CIV. P. 56(c), (e).

III.   <u>**Discussion**</u>

ERISA, a "comprehensive and reticulated statute" governing the establishment and administration of employee benefit plans, "provides 'a panoply of remedial devices' for participants and beneficiaries of benefit plans." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 108 (1989) (quoting <u>Mass. Mut. Life Ins. Co. v. Russell</u>, 473 U.S. 134, 146 (1985)).  One of these devices, embodied in 29 U.S.C. § 1132(a)(1)(B), is a federal cause of action for private employees "to recover

20

benefits due . . . under the terms" of these plans.  Id.  This provision permits private

employees to bring a federal breach of contract claim against administrators who

fail to conform with plan provisions.  See Mass. Mut. Life, 473 U.S. at 148 (stating

that ERISA was enacted "to protect contractually defined benefits").

A denial of benefits under ERISA is reviewed by the court de novo, unless the

benefit plan gives the plan's administrator discretionary authority to determine

eligibility for benefits or to construe the terms of the plan.  See Firestone, 489 U.S.

at 115.  Where such discretionary authority exists the court must use an arbitrary

and capricious standard of review.  See id.; Lasser v. Reliance Standard Life Ins.

Co., 344 F.3d 381, 384 (3d Cir. 2003); Skretvedt v. E.I. DuPont de Nemours & Co.,

268 F.3d 167, 173-74 (3d Cir. 2001).  "Under the arbitrary and capricious standard,

an administrator's decision will only be overturned if it is without reason,

unsupported by substantial evidence or erroneous as a matter of law, and the court

is not free to substitute its own judgment for that of the defendants in determining

eligibility for plan benefits."  Lasser, 344 F.3d at 384 (quoting Pinto v. Reliance

Standard Life Ins. Co., 214 F.3d 377, 387 (3d. Cir. 1999)); see also Weinberger v.

Reliance Standard Life Ins. Co., 54 F. App'x 553, 555 (3d Cir. 2002) (same).

The Third Circuit Court of Appeals has adopted a "sliding scale" in ERISA

cases where the arbitrary and capriciousness standard of review applies.  Pinto, 214

F.3d at 392.  This sliding scale allows a court to balance the "inherent conflict of

interest" that exists when the entity that determines whether a claimant is disabled

must also pay for the disability benefits.  Lasser, 344 F.3d at 385; see also Lemaire v.

Hartford Life & Acc. Ins. Co., 69 F. App'x 88, 92 (3d Cir. 2003) ("[An inherent conflict arises] because there exists 'an active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers.'" (quoting Pinto, 214 F.3d at 387-88)).  Under the sliding scale standard a court must review not only the result reached by the administrator and whether that result is supported by reason, but also "the process by which the result was achieved." Pinto, 214 F.3d at 393.  The court must look for "discrete factors"  that may indicate whether the administrator's denial of benefits was based upon the conflict of interest.  See id. at 379.  This includes an examination of the "sophistication of the parties, the information accessible to them, the exact financial arrangement between the insurer and the employer, and the status of the fiduciary." Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004) (citation omitted); see also In re Diet Drugs Prod. Liab. Litig., 401 F.3d 143, 173 (3d Cir. 2005).  Procedural "anomalies," such as an administrator's inconsistent treatment of the same facts or self-serving selectivity of facts, may require the court to "ratchet up" the standard of review and cast skepticism on the administrator's decision. Pinto, 214 F.3d at 394.  "The greater the evidence of conflict on the part of the administrator, the less deferential [the court's] abuse of discretion standard." Id. at 393 (quoting Vega v. Nat'l Life Ins. Serv., Inc., 188 F.3d 287, 297 (5th Cir. 1999)).

Following an assessment of the Pinto factors and the circumstances surrounding an administrator's decision, the court must determine "a range, not a

point" for the arbitrary and capricious standard.  <u>Lasser</u>, 344 F.3d at 385.  The range

must be "more penetrating the greater is the suspicion of partiality," and "less

penetrating the smaller that suspicion is."  <u>Id.</u> at 385 (quotation omitted); <u>see also</u>

<u>Lemaire</u>, 69 F. App'x at 92 (holding that trial court correctly applied heightened

arbitrary and capricious standard because of factors weighing in favor of decision

based upon conflict of interest); <u>Lasser</u>, 344 F.3d at 385 (holding that trial court

correctly applied "mild" arbitrary and capricious standard where no facts in record

upon which to infer that decision was based upon conflict of interest); <u>Creelman v.</u>

<u>E.I. DuPont de Nemours & Co.</u>, No. 04-CV-1618, 2005 WL 2106230, at *6 (M.D. Pa.

Aug. 31, 2005) (applying "slightly less deferential" arbitrary and capricious standard

where no interest in maintaining employee moral and plan paid out of pocket).


### A.    Standard of Deference Applicable to this Case

In the matter *sub judice*, it is undisputed that the plan at issue grants to

Liberty the authority "to construe the terms of th[e] policy and to determine benefit

eligibility." (Doc. 17 at LL-0037.)  Accordingly, an arbitrary and capricious standard

of review applies.  <u>See</u> <u>Firestone</u>, 489 U.S. at 108.  Pursuant to the Third Circuit's

sliding scale approach, the court must next consider the <u>Pinto</u> factors to determine

the range of deference owed under this standard.  <u>See</u> <u>Pinto</u>, 214 F.3d at 392; <u>see</u>

<u>also</u> <u>In re Diet Drugs</u>, 401 F.3d at 173.

Under the first factor, the sophistication of the parties, the court notes that

Lightner initially attempted to navigate her way through the claims process by

herself.  However, after Liberty's initial denial of benefits, Lightner retained the

services of counsel.  Counsel corresponded with Liberty directly, represented

Lightner during the appeal of Liberty's initial decision, and supplemented the

record on Lightner's behalf.  Because Lightner had the assistance of an attorney,

the court finds that the parties were equally sophisticated in the claims process.

The court also finds that Lightner was not at a disadvantage with respect to

the second <u>Pinto</u> factor, the parties' accessibility to pertinent information.  Liberty

was under an obligation to review evidence submitted by Lightner.  (<u>See</u> Doc. 17 at

LL-0017-18).  Clearly, Lightner had equal—if not greater—access to her medical

records and the information pertinent to Liberty's review of her claim.

With respect to the third factor, the exact financial arrangement between

insurer and the employer, the parties have not addressed this issue.  A plan may be

funded on a fixed price basis that has been actuarially determined, <u>see</u> <u>Stratton</u>, 363

F.3d at 255, or funded by a trust from which the employer cannot draw funds, <u>see</u>

<u>Sommer v. Prudential Ins. Co. of Am.</u>, 138 F. App'x 426, 427 (3d Cir. 2005), hence

lessening the likelihood of a conflict of interest.  A plan may also be funded by the

employer on a case-by-case basis, where each dollar denied accrues to the

employer, thereby requiring an increase in the intensity of the court's review.  <u>See,</u>

<u>e.g.,</u> <u>Stratton</u>, 363 F.3d at 255.  In this case, the terms of Lightner's policy reflect that

HMC pays to Liberty a fixed monthly premium.  The premium may be increased by

Liberty "at any time for reasons which affect the risk assumed," including such

occurrences as a "change . . . in the policy design," the addition to the policy of a

"division, subsidiary, or [a]ssociated [c]ompany," an increase by 15% or more in the number of covered persons, or a "change in existing law" that affects the policy. (Doc. 17 at LL-0041.)  While the policy does not indicate if the granting of a claim will "affect the risk assumed," the court will err on the side of caution and assume that HMC's premiums would increase if Liberty granted Lightner's disability claim. Accordingly, the court will weigh this factor in favor of lowering the deference owed to Liberty's determination.

Finally, with respect to the status of the fiduciary, the court must consider whether "the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction." Stratton, 363 F.3d at 254.  Once again, this factor was not addressed by the parties.  Lightner has not alleged any facts regarding the financial health or long term plans of the company that would undermine the "presumed desire to maintain employee satisfaction." Id. at 255 (quoting Pinto, 214 F.3d at 392).  However, that Liberty is an independent entity not associated with HMC raises the court's concern, because the administrator of the plan does not have a strong incentive to keep HMC employees satisfied by granting meritorious claims.  See Skretvedt, 268 F.3d at 174; Pinto, 214 F.3d at 388; Nazay v. Miller, 949 F.2d 1323, 1335 (3d Cir. 1991); see also Pinto, 214 F.3d at 378 ("[W]hen an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review."); Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen, 222 F.3d 123, 129 n.7 (3d Cir. 2000) (same); Sommer, 138

25

F. App'x at 427 (same).  Hence, this factor also weighs in favor of decreasing the amount of deference owed by the court to Liberty's determination.

After reviewing the <u>Pinto</u> factors and the circumstances surrounding this case, the court concludes that a less deferential standard of arbitrary and capricious review applies in this case.  Accordingly, the court will give only limited deference to Liberty's decision to grant and then terminate benefits, diminished sufficiently to negate any untoward influence.

**B.**   **Application**

The gravamen of Lightner's claim is that she provided to Liberty sufficient evidence to demonstrate an ongoing disability and an inability to perform the material and substantial duties of her employment.  (Doc. 13 at 3.)  She argues that Liberty acted arbitrarily and capriciously:  (1) by failing to obtain all of Lightner's physician records prior to its initial denial of benefits; (2) by ignoring her extensive medical treatment; (3) by ignoring the restrictions and limitations her physicians placed upon her; and (4) by failing to suggest which tests that her physicians should perform to provide sufficient proof of her disability.  (Doc. 13 at 3, 7-8, 13.)  Lightner further argues that, by refusing to reopen her claim, Liberty has precluded her from "working with her physicians to provide objective proof of her disability."  (Doc. 13 at 14.)

With respect to Lightner's first argument, that Liberty failed to obtain all of her medical records prior to making its initial determination, the court is unpersuaded that this was arbitrary and capricious conduct.  A plan administrator

does not have an affirmative obligation to conduct an investigation into the alleged disability.  See Pinto, 214 F.3d at 394 n.8.  Further, the very terms of the Liberty policy require Lightner—not Liberty—to produce sufficient proof of eligibility for benefits.  (Doc. 17 at LL-0017.)

Nor did Liberty ignore the evidence presented by Lightner.  To the contrary, the evidence demonstrates that Liberty conducted a careful review of the documents.  The nurse assigned to Lightner's claim reviewed the medications prescribed to Lightner, the results of the CAT scan, MRI, and neurological examinations, and Dr. Argires' assessment that Lightner may have been suffering from post traumatic stress disorder, and may have contused the frontal branches of her supra-orbital nerve.  (Doc. 17 at LL-0185.)  The nurse's notes reflect that Lightner's position as a patient billing assistant was "sedentary" work, and questioned how Dr. Argires had diagnosed Lightner as suffering from post concussion syndrome, as this diagnosis was contradicted by the "grossly normal" results of the objective tests that were submitted.  (Doc. 17 at LL-0154, 0185-86.)  Lightner's purported disability was not supported by her physican's "standard of diagnosis, chart notes, lab findings, test results, x-rays and[/]or other forms of objective medical evidence," as required by the terms of the policy.  (Doc. 17 at LL-0097.)  Nor did the evidence reflect that Lightner was "unable to perform the [m]aterial and [s]ubstantial [d]uties" of her occupation.  (Doc. 17 at LL-0006; see also id. at LL-0008 (defining "material and substantial duties").)

Lightner also contends that Liberty did not convey to her what would constitute sufficient proof of her disability such that she would be entitled to benefits under the policy.  The evidence of record belies this argument.  Liberty noted that Lightner's alleged condition entailed "neuropsychological deficits" and "traumatic brain injury or concussion."  (Doc. 17 at LL-0183.)  Lightner's physicians did not perform any tests to determine her neuropsychological state, and the tests that were performed indicated that Lightner did not suffer from any brain injury.  Liberty specifically suggested to Lightner that she submit the results from "[a] neuro-psychological examination," "diagnostic test results [such as from an] EMG," and "any other diagnostic clinical data" to support her claim.  (Doc. 17 at LL-0146, 0183.)

Nor can the court conclude that Liberty acted arbitrarily and capriciously in placing emphasis on the opinions of Dr. Brown over those of Dr. Godshall, as "[p]lan administrators are not obliged to accord special deference to the opinions of treating physicians."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003); see also Stratton, 363 F.3d at 258 ("A professional disagreement does not amount to an arbitrary refusal to credit.").  Records from Dr. Godshall consisted of little more than excuse slips, unsupported by any objective evidence and, in any event, Dr. Brown's assessment was consistent with that of Lightner's treating physician, Dr. Argires, that Lightner was capable of returning to work on a graded basis.

Finally, the court is unpersuaded that Liberty precluded Lightner from "working with her physicians to obtain objective proof" of her condition.  Liberty was specific in its requests for objective information.  It continued to accept supplemental materials from Lightner and her counsel, and even extended the period for review of her appeal so that Lightner could submit additional records. Indeed, even after the review process was completed, Lightner continued to submit information, none of which consisted of objective proof of her disability.

## IV.   <u>Conclusion</u>

Following a thorough review of the record, and giving minimal deference to Liberty's determination, the court cannot conclude that Liberty acted without reason, or that the denial of disability benefits was not substantially supported by the evidence before it.  <u>See</u> <u>Lasser</u>, 344 F.3d at 384; <u>see also</u> <u>Pinto</u>, 214 F.3d at 87. Accordingly, the court will grant Liberty's motion for summary judgment, and deny Lightner's motion for summary judgment.

An appropriate order will issue.


  <u>/s/ Christopher C. Conner</u>
CHRISTOPHER C. CONNER
United States District Judge


Date:      March 31, 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JULIE LIGHTNER,** | : | **CIVIL ACTION NO. 1:04-CV-2334** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **LIBERTY LIFE ASSURANCE** | : | |
| **COMPANY OF BOSTON,** | : | |
| | : | |
| **Defendant** | | |

## <u>ORDER</u>

AND NOW, this 31st day of March, 2006, upon consideration of the cross-motions (Docs. 12, 14) for summary judgment, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.  The motion for summary judgment (Doc. 14), filed by defendant Liberty Life Assurance Company of Boston, is GRANTED.

2.  The motion for summary judgment (Doc. 12), filed by plaintiff Julie Lightner, is DENIED.

3.  The Clerk of Court is directed to enter JUDGMENT in favor of defendant Liberty Life Assurance Company of Boston and against plaintiff Julie Lightner.

4.  The Clerk of Court is directed to CLOSE this case.


  /s/ Christopher C. Conner  
CHRISTOPHER C. CONNER
United States District Judge